IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

v.  CRIMINAL CASE NO. 3:21CR00086

LOGAN HUNTER POWER

## INFORMATION

## THE ACTING UNITED STATES ATTORNEY CHARGES:

### The Medicare Program

1. The Medicare Program ("Medicare") was a federal health insurance program, affecting commerce, that provided benefits to persons who were 65 years of age and older or disabled.

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3. Medicare was administered by the United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS").

4. Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary was given a unique Medicare identification number.

5. Medicare included coverage under component parts. Beneficiaries were eligible to receive a variety of services, including physician services ("Part B") and prescription drug coverage ("Part D").

6. Part B covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

7. Part D subsidized the costs of prescription drugs for participating beneficiaries. Part D covered drugs that were dispensed upon a valid prescription and for a medically accepted indication that facilitated the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

8. In order to receive Part D benefits, a beneficiary enrolled in a Medicare drug plan. Medicare Part D drug plans were operated by private health care insurance companies approved by Medicare and referred to as drug plan "sponsors." A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

9. CMS compensated the Medicare sponsors for providing prescription drug benefits to beneficiaries. CMS paid Medicare sponsors a monthly fee for each beneficiary enrolled in the Medicare sponsors' plans. Such payments were called capitation fees. The capitation fee was adjusted periodically based on various factors, including beneficiaries' medical conditions. In addition, in some cases where a Medicare sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's capitation fee, CMS reimbursed the Medicare sponsor for a portion of those additional expenses.

10. A pharmacy could participate in the Part D program by entering into a provider agreement with a Part D drug plan or with a Pharmacy Benefit Manager ("PBM"), which acted on behalf of one or more drug plans. Pharmacies entered into contractual agreements with PBMs either directly or indirectly. If indirectly, providers first contracted with pharmacy network groups,

which then contracted with PBMs on behalf of providers. By contracting with drug plans or PBMs, directly or indirectly, pharmacies agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

11. As part of the Medicare enrollment process, health care providers, including physicians, pharmacies, and laboratories, submitted enrollment applications to Medicare. To participate in Medicare, providers were required to certify that they would comply with all Medicare-related laws, rules, and regulations, including, among others, the Federal Anti-Kickback Statute. If Medicare approved a provider's application, Medicare assigned the provider a Medicare provider number. A provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for medically necessary items and services rendered to beneficiaries.

12. When seeking reimbursement from Medicare under Part B, providers submitted the cost of the service provided together with the appropriate "procedure code," as set forth in the Current Procedural Terminology Manual or the Healthcare Common Procedure Coding System.

13. Under Part D, upon receiving prescriptions, pharmacies submitted claims for dispensing prescription drugs to Medicare or to PBMs. Medicare or PBMs reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries.

**Foot Bath Medications**

14. Providers sometimes prescribed antibiotic and antifungal drugs to be used in foot baths. These foot bath medications were prescribed, purportedly, to treat a variety of fungal, bacterial, or other types of foot infections. Typical diagnoses used to support these prescriptions included ingrown toenails, cellulitis, diabetic ulcers, sores, and athlete's foot.

15. Often, beneficiaries were prescribed a cocktail of expensive drugs (including capsules, creams, and powders), provided with a plastic foot tub free of charge, and instructed by

3

the pharmacy to mix the medications with warm water in order to soak their feet. These foot bath cocktails routinely included vancomycin 250 mg capsules, calcipotriene 0.005% cream, clindamycin phosphate 1% solution, ketoconazole 2% cream, and other drugs. Typically, the drugs selected for use in foot baths did not require pre-authorization from Medicare prior to prescribing them to a beneficiary. Additionally, the majority of these drugs were not subject to utilization management, meaning that there is no limit on the quantity of drugs that could be ordered in a single prescription.

### Diagnostic Molecular Testing

16. Diagnostic molecular tests were laboratory tests that used polymerase chain reaction testing and metagenomics to extract DNA from fungi to determine whether different types of bacteria were present in the specimen provided.

17. To conduct diagnostic molecular testing, a laboratory had to obtain a biological specimen from the patient. One way to obtain a biological specimen was to extract nail clippings from a patient, and another way was to take a culture of a patient's wound. The biological specimen was then submitted to the diagnostic laboratory to conduct the test.

18. Biological specimens were submitted along with requisitions, or orders, that identified the patient, the patient's insurance, and indicated the specific tests to be performed. In order for laboratories to submit claims to Medicare for diagnostic molecular tests, the requisitions had to be signed by a physician or other authorized medical professional, who attested to the medical necessity of the test.

### The Defendant and Relevant Entities and Individuals

19. The defendant, **LOGAN HUNTER POWER**, was a resident of Lafayette County, Mississippi who worked as a marketer for various pharmacies and diagnostic laboratories through his company, Power Medical, LLC ("Power Medical").

20. Pharmacy 1 was a Louisiana limited liability company registered on or about February 7, 2017. Pharmacy 1 operated as a retail and mail-order pharmacy with locations in East Baton Rouge Parish and Jefferson Parish, Louisiana.

21. Co-conspirator 1 was an owner of Pharmacy 1 and resident of Franklin County, Ohio.

22. Laboratory 1 was a Virginia limited liability company registered on or about April 1, 2011. Laboratory 1 operated as an independent clinical laboratory in Henrico County, Virginia.

23. Co-conspirator 2 was the National Sales Manager of Laboratory 1 and a resident of Knox County, Tennessee.

24. Podiatrist 1, a resident of Yalobusha County, Mississippi, was a podiatrist licensed to practice in the State of Mississippi who had the ability to prescribe medications.

25. Podiatrist 2, a resident of DeSoto County, Mississippi, was a podiatrist licensed to practice in the State of Mississippi who had the ability to prescribe medications.

26. Podiatrist 3, a resident of Lafayette County, Mississippi, was a podiatrist licensed to practice in the State of Mississippi who had the ability to prescribe medications.

### COUNT 1
### Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

27. Paragraphs 1 through 26 of this Bill of Information are re-alleged and incorporated by reference as though fully set forth herein.

5

28. Beginning in or around January 2018, and continuing through in or around August 2020, in the Northern District of Mississippi, and elsewhere, the defendant,

**LOGAN HUNTER POWER,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with Pharmacy 1, Co-conspirator 1, Laboratory 1, Co-conspirator 2, Podiatrist 1, Podiatrist 3, and others, known and unknown to the United States Attorney, to:

    a. defraud the United States by cheating the United States government or any of its agencies out of money and property, and by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of HHS in its administration and oversight of Medicare, and to commit certain offenses against the United States, that is:

    b. to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A)-(B) by soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare, and in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part by a Federal health care program, that is, Medicare; and

    c. to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A)-(B) by offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to refer an individual

to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare, and to purchase, lease, order, and arrange for and recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part by a Federal health care program, that is, Medicare.

### Purpose of the Conspiracy

29. It was the purpose of the conspiracy for **POWER** and his co-conspirators to unlawfully enrich themselves and others known and unknown to the United States Attorney by, among other things: (a) offering, paying, soliciting, and receiving kickbacks and bribes in return for prescriptions for foot bath medications and orders for diagnostic molecular testing; (b) submitting and causing the submission of claims to Medicare for the dispensing of foot bath medications and the conducting of diagnostic molecular testing that were (i) medically unnecessary and (ii) obtained through the payment of kickbacks and bribes and therefore not eligible for Medicare reimbursement; (c) concealing the submission of false and fraudulent claims to Medicare and the receipt and transfer of the proceeds of the scheme; and (d) diverting proceeds of the scheme for the personal use and benefit of the defendant and his co-conspirators.

### Manner and Means of the Conspiracy

30. The manner and means by which the defendant and his co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

    a. **POWER** offered to pay, and paid, kickbacks and bribes to Podiatrist 1, Podiatrist 2, Podiatrist 3, and others. These payments were made in exchange for prescriptions for foot bath medications referred to Pharmacy 1 and orders for diagnostic molecular testing referred to Laboratory 1. **POWER** knew that Pharmacy 1 and Laboratory 1 would bill Medicare for the

7

medically unnecessary foot bath medications and diagnostic molecular tests provided to beneficiaries.

      b.     In exchange for referrals from **POWER**, Pharmacy 1 and Laboratory 1, through Co-conspirator 1 and Co-conspirator 2, paid **POWER** a percentage of reimbursements received from Medicare for the dispensing of foot bath medications and the conducting of diagnostic molecular testing.

      c.     In or around January 2018, **POWER** entered into an agreement with Laboratory 1 and Co-conspirator 2 whereby **POWER** would receive twenty-five percent of the reimbursements received by Laboratory 1 after billing insurers, including Medicare, for conducting diagnostic molecular testing referred by **POWER** and ordered by Podiatrist 1, Podiatrist 2, Podiatrist 3, and other providers.

      d.     In or around January 2019, **POWER** entered into a purported employment agreement with Pharmacy 1 and Co-conspirator 1 whereby **POWER** would receive thirty percent of the reimbursements received by Pharmacy 1 after billing insurers, including Medicare, for dispensing of medications referred by **POWER**, including foot bath medications prescribed by Podiatrist 1, Podiatrist 2, Podiatrist 3, and other providers.

      e.     **POWER** was not a bona fide employee of Laboratory 1 or Pharmacy 1. Pharmacy 1 disguised the true nature of the payment relationship by providing **POWER** with an IRS Form W-2. Pharmacy 1 further disguised the true nature of the payment relationship by stating that the sham employment agreement did not violate the Federal Anti-Kickback Statute.

      f.     **POWER**, Pharmacy 1, Co-conspirator 1, Laboratory 1, Co-conspirator 2, and others tracked the foot bath medications and diagnostic molecular test orders referred by

**POWER**, in addition to the reimbursements received from Medicare and other insurers and the amounts of the kickback and bribe payments.

    g.  **POWER**, Podiatrist 1, Podiatrist 2, Podiatrist 3, and others communicated by text message, email, and other forms of communication to inform each other of the amount of Medicare reimbursements, the payment of kickbacks and bribes, and other matters related to the scheme.

    h.  From in or around January 2018 through May 2020, Laboratory 1 received approximately $2,198,273.92 in reimbursements from Medicare for conducting diagnostic molecular testing of beneficiaries ordered by Podiatrist 1 and Podiatrist 3.

    i.  During the same time period, Laboratory 1 paid approximately $140,557.76 in kickbacks to **POWER**, through Power Medical, for the referral of orders for diagnostic molecular testing by Podiatrist 1, Podiatrist 3, and others.

    j.  From in or around February 2019 through August 2020, Pharmacy 1 received approximately $767,366.70 in reimbursements from Medicare for dispensing foot bath medications prescribed by Podiatrist 1 and Podiatrist 3.

    k.  During the same time period, Pharmacy 1 paid approximately $121,362.56 in kickbacks to **POWER**, through Power Medical, for the referral of prescriptions for foot bath medications by Podiatrist 1, Podiatrist 3, and others.

    l.  In turn, **POWER** paid approximately $133,000 in kickbacks to Podiatrist 1, Podiatrist 3, and others in exchange for referrals.

### Overt Acts

  31.  In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Northern District of Mississippi

9

and elsewhere, at least one of the following overt acts, among others:

    a.    On or about January 30, 2020, **POWER** delivered a cash kickback payment to Podiatrist 3. The same day, **POWER** texted Podiatrist 3, "Leaving your parking lot. Left you something in your gas tank."

    b.    On or about June 11, 2020, during a consensually monitored meeting, **POWER** told Podiatrist 2 that he had a "deal" with Podiatrist 1 to pay Podiatrist 1 forty percent of the reimbursements from insurers for prescriptions or tests ordered by Podiatrist 1, including for diagnostic molecular tests conducted by Laboratory 1.

    c.    On or about July 14, 2020, during a consensually monitored meeting among **POWER**, Co-conspirator 1, and Podiatrist 2, **POWER** handed Podiatrist 2 an envelope containing a $250 cash kickback. **POWER** stated that the cash was for "prescriptions" written by Podiatrist 2 and dispensed by Pharmacy 1.

    d.    During the July 14, 2020 meeting, **POWER** stated, "this is just one avenue, that's just the pharmacy, you start writing to the lab, that's where the money is."

All in violation of Title 18, United States Code, Section 371.

## **FORFEITURE ALLEGATIONS**

29.    Upon conviction of the offense set forth above, the defendant, **LOGAN HUNTER POWER**, shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(7), all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds of the violation, including but not limited to a sum of money equal to the amount of the gross proceeds of the offense.

30.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

b. has been placed beyond the jurisdiction of the court;

c. has been substantially diminished in value; or

d. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

DATE: 9/30/2021

UNITED STATES OF AMERICA, by

CLAY JOYNER
Acting United States Attorney
Mississippi Bar No. 10316